**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DONALD INGRASSELINO,

                   Plaintiff,

         v.

MADISON SQUARE GARDEN
ENTERTAINMENT CORP. and JOHN
EVERSOLE, individually,

                 Defendants.

Case No.: 1:25-cv-7980

**COMPLAINT**

**JURY TRIAL DEMANDED**

     Plaintiff Donald Ingrasselino ("Mr. Ingrasselino" or "Plaintiff"), by his undersigned attorneys, Reavis Page Jump LLP, for his complaint (the "Complaint") against defendants Madison Square Garden Entertainment Corp. ("MSG" or the "Company") and John Eversole ("Mr. Eversole"), the Company's Executive Vice President and Chief Security Officer (together, the "Defendants"), alleges as follows:

## NATURE OF THE ACTION

    1.    Plaintiff brings this action against Defendants for unlawful discrimination, hostile treatment, and ultimate wrongful termination of Plaintiff's employment on the basis of his disabilities and age, as well as retaliation on the basis of his disabilities, in violation of the New York State Human Rights Law, N.Y. Exec. Law §§ 290 *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-101 *et seq.*, as applicable. Plaintiff also brings this action against Defendant MSG for its retaliation and ultimate wrongful termination of his employment in response to his whistleblower complaints, in violation of New York Labor Law § 740. Further, Plaintiff brings the action against Defendant MSG for its violation of New York Labor Law § 201-d based on its wrongful termination of him purportedly for attending an event. Plaintiff also brings

claims against MSG for breach of contract, promissory estoppel, and violation of the duty of good faith and fair dealing due to damages caused to him as a result of the Company revoking an agreement on which he relied, and for unjust enrichment and conversion resulting from MSG's withholding and mistreatment of Plaintiff's property.

2.     Mr. Ingrasselino, who is 49 years old, was terminated on February 20, 2024, from his position as Vice President of Shared Security Services working for Defendants.  Defendants discriminated against Mr. Ingrasselino and created a hostile work environment for him based on his disabilities and age during his employment, and retaliated against him for requesting reasonable accommodations.  Defendants further retaliated against him after he voiced concerns and complained about numerous legal violations to Defendants, who abruptly fired him and claimed the decision was made for reasons that are verifiably false (and would otherwise be in violation of New York Labor Law).

3.     Mr. Ingrasselino suffers from Type 1 diabetes.  Despite Mr. Ingrasselino's efforts to keep his disability private, his supervisor, Mr. Eversole, repeatedly disclosed it to his colleagues and subjected him to harassment and discrimination on account of his diabetes and other medical conditions.  In addition to refusing to let Mr. Ingrasselino take sick time necessary to manage his condition, Mr. Eversole publicly disclosed his disability to other employees and mocked Mr. Ingrasselino in front of his colleagues for suffering from diabetes.  Mr. Eversole informed his coworkers that Mr. Ingrasselino is "sick" and would "die if he eats sugar [because] he's weak," and further taunted him by placing sweets outside of Mr. Ingrasselino's office while remarking that he could not eat them because he is "sick."

4.     Once Mr. Ingrasselino began working directly for and closely with Mr. Eversole, he began attacking Mr. Ingrasselino for being "too old" for his job.  Mr. Eversole told Mr.

Ingrasselino, "I need to stop hiring old guys" and once asked him "can you keep up with that at your age" (referring to his expectation that Mr. Ingrasselino be available to him 24/7, 365 days a year). Mr. Eversole often referred to Mr. Ingrasselino as "old," including calling him "another old retired cop" and an "old failure." Mr. Eversole told him in one instance "a younger man would have accomplished the same [task that took 25 minutes] in 15 minutes." In another instance, Mr. Eversole told Mr. Ingrasselino that because he "failed" to see an email sent before his morning work start time, which required no action on Mr. Ingrasselino's part, "if you are too old to handle this level of work, I will fire you immediately for this and find someone else who is capable." Mr. Eversole and MSG also refused to hire other individuals based on their discrimination of the candidates due to their age.

5.      The hostility toward Mr. Ingrasselino based on his disabilities and age not only led to disgustingly offensive comments by Mr. Eversole to him, but led to further harassing behavior, including, for example, punishment for what Mr. Eversole perceived as Mr. Ingrasselino not being "better" as a result of his age and appearance. In addition to targeting and scapegoating Mr. Ingrasselino with unwarranted discipline due to his age, Mr. Eversole at the same time failed to take any disciplinary action against younger and more youthful-appearing employees who actually did or appeared to commit offenses.

6.      Mr. Ingrasselino was also targeted by Defendants in response to his many complaints about MSG and Mr. Eversole's discrimination, illegal directives and activities, and other legal violations. Below is a summary of complaints made by Mr. Ingrasselino to Defendants.

7.      First, Mr. Ingrasselino complained about Mr. Eversole's directions that he and his team imbed themselves in the middle of protests and riots held entirely outside of MSG property and the scope of their employment duties, without proper equipment, direction or planning, and

without law enforcement back up.  Similarly, Mr. Ingrasselino complained about directives from Mr. Eversole that his direct reports remove scalpers and drug dealers daily, in areas outside and around MSG properties, without back up, communication, or assistance from MSG venue security or NYPD paid detail.  Mr. Ingrasselino expressed in his complaints that MSG had no legal authority to carry out Mr. Eversole's orders on public property.  Mr. Ingrasselino forwarded specific safety complaints from Investigator Beatriz Solorzano to Vice Presidents James Rivera and Brian Conroy, MSG's Director of Intelligence, and numerous Senior Vice Presidents at MSG, including Darren Claphan and Ryan Dupree, who both informed Mr. Ingrasselino that he should not raise his safety concerns with Mr. Eversole because that will get him and Ms. Solorzano fired. Since his termination, at least two of Mr. Ingrasselino's former colleagues and MSG employees were attacked and injured as a direct result of MSG's failure to heed his warnings about the unsafe and unlawful actions stemming from Defendants' direction that the Threat Management team interfere with dangerous activities off-premises outside the scope of their work, without receiving support from the NYPD.

8.      Second, Mr. Ingrasselino also complained about his direct reports being armed on behalf of MSG and on Company premises, which Mr. Eversole directed, as this was not only illegal, but also raised safety concerns due to potential escalation resulting from brandishing such weapons.  Specifically, carrying weapons in serving as MSG security as opposed to carrying them as private individuals – where permitted to as former officers under the Law Enforcement Officers Safety Act – did not comply with the law.  And yet, Mr. Eversole instructed employees to do so. Mr. Ingrasselino further complained about Mr. Eversole open carrying his own gun while at work, which in of itself Mr. Ingrasselino believed to pose a separate violation of law since Mr. Eversole did not, on information and belief, have a New York license to carry a concealed weapon or to

openly carry a firearm, which is a legal requirement wholly outside of any protections warranted by the Law Enforcement Officers Safety Act.

9.    Third, Mr. Ingrasselino complained about orders made to him by Mr. Eversole to perform full and intrusive background checks, surveillance, and assessments into individuals' private backgrounds who were of no threat to MSG itself, but were personal enemies of Mr. Eversole or MSG's CEO, James Dolan.  Mr. Ingrasselino did not believe it was lawful for him to violate these individuals' privacy for what he understood to be for no legitimate business reason. MSG's unlawful targeting included MSG venue guests, lawyers, customers, and sports fans who articulated frustration with team losses, chanting for Mr. Dolan to sell the Knicks, or simply using foul language.

10.    Fourth, Mr. Ingrasselino pushed back against assignments he and his team were given to conduct overreaching surveillance of MSG guests, customers, and employees, including directives to take photographs of the individual and their family members, and obtain their social security number and financial information.  Mr. Ingrasselino consistently and repeatedly voiced his concerns to numerous Directors at MSG regarding not only the blatant and unjustified invasion of these individuals' privacy, but also the lack of appropriate storage and wide dissemination of this highly sensitive information, and lack of protocols with respect to the same.

11.    Fifth, Mr. Ingrasselino complained about the unlawful use of MSG's facial recognition software, which reflected MSG's misrepresentations of its purpose, in order to cover up its unlawful intent to target personal enemies of the Company, Mr. Eversole, and Mr. Dolan. Mr. Ingrasselino believes that MSG created an after-the-fact false narrative in an attempt to legitimize the software's basis, and he pointed out the holes in such a narrative – namely, in his complaints about how MSG claimed the service could be used to assist the FBI, but failed to

implement any policies that would actually put such a goal into effect. At the same time, MSG conversely had policies to address and prevent private individuals from entering its premises when they were perceived as personal "threats." Notably, despite Mr. Ingrasselino seeking to implement policies that would add functions to the software and enable it to legitimately assist the FBI, Mr. Eversole refused to engage, demonstrating that MSG's use of facial recognition technology was intended to keep out those that MSG did not want entering its venues. One example of Mr. Eversole's use of the facial recognition software demonstrates the illegal discriminatory means in which it was used. Namely, Mr. Eversole directed MSG security leadership to keep a transgender woman named "Mia" on the "do not enter" list through use of the facial recognition software, telling them to "keep him or it or whatever it is away from the [Knicks] players" (referring to Mia). Mr. Ingrasselino believes that Mia was targeted because of her gender identity and not because she posed any type of legitimate threat to MSG or to the Knicks. During several weekly leadership meetings, in which Mr. Ingrasselino was in attendance, Mr. Eversole would take a photo of "Mia" from his cell phone and show everyone in attendance, openly mocking and ridiculing her to all meeting attendees, consisting of MSG Threat Management Vice Presidents and Directors. After Mr. Eversole would finish mocking Mia, he would remind leadership that "he" is banned from MSG. On information and belief, Mr. Eversole did not similarly limit access to others who socialized with athletes, including individuals who had extensive criminal histories and had the potential of posing a legitimate threat to MSG.

12.    Sixth, Mr. Ingrasselino complained about MSG's failure to protect the safety of its guests in supporting and continuing use of products by Xtract One Technologies, a company in which MSG senior employees held investments and board positions, despite Mr. Ingrasselino's complaints and warnings that they posed serious safety hazards. Specifically, MSG venues utilized

Xtract One Technologies' weapons detection systems, pushing their use at all ingress and egress points of its venues, despite their extensive failures to operate as intended with a roughly 70% failure rate in detecting unauthorized objects like guns, knives, and other metallic items.  Mr. Ingrasselino expressly flagged the safety concerns and system failures, which he believed directly violated MSG's obligations to comply with the National Hockey League and National Basketball Association's security protocols.  However, on information and belief, Mr. Eversole and other senior MSG personnel who Mr. Ingrasselino believes were investors in Xtract One Technologies, failed to adhere to conflict of interest protocols and legal obligations in appropriately responding to Mr. Ingrasselino's complaints, and thus failed to protect the safety of those who attended events at MSG's venues.  Mr. Ingrasselino was ordered by Mr. Eversole to refrain from discussing the technology failures he had uncovered (and told Mr. Eversole about), and that any notes he had reflecting the failures be sent only to Mr. Eversole.

13.    Seventh, Mr. Ingrasselino complained about Mr. Eversole's discrimination of women in referring to certain female employees as "toxic and crazy" and "crazy bitches."  He complained not only to Mr. Eversole (who instructed him not to engage with the women, despite being Mr. Ingrasselino's subordinates), but to numerous Directors and other Vice Presidents at MSG because he thought the treatment was wrong and causing harm to the women (who he consoled on several occasions as they cried about the mistreatment), and because he feared the illegal behavior could result in legal and liability issues for MSG.  In response, Mr. Ingrasselino was told to keep quiet and not get involved, and that if he did, he would be fired.

14.    Eighth, Mr. Ingrasselino complained about MSG senior executives' sexualization of female employees.  Specifically, Mr. Ingrasselino took issue when Mr. Eversole would require Alexandria Baker, Director of Security Operations, a female direct report of Mr. Ingrasselino, to

continually cancel her previously approved time off and come to the office, only to apparently sit with Mr. Eversole and "hang out" with him for no apparent legitimate reason. Mr. Ingrasselino approached Mr. Eversole and inquired as to Ms. Baker's job description, schedule, and responsibilities so that he could attempt to limit her forced PTO cancellations. But Mr. Eversole ignored the complaints and told Mr. Ingrasselino that he (Mr. Eversole) and Mr. Dolan kept Ms. Baker around because they liked to look at her. Mr. Ingrasselino complained of this and of his own mistreatment by Mr. Eversole to Glenn Macapagal of Human Resources as recently as a week prior to his termination.

15.    Lastly, Mr. Ingrasselino complained about Mr. Eversole's decision to disregard public safety and violate policies and contracts in his directive restricting the use of K-9 dogs for bomb sniffing and other security functions at MSG sporting events due to Mr. Dolan's disdain for dogs.

16.    In addition, Mr. Ingrasselino found it futile to complain about other unlawful actions at MSG that he was asked to participate in and opposed after seeing how his other complains had been treated. These included Mr. Eversole's instruction that he and other employees figure out how to track MSG employees' personal email accounts to monitor them, as well as instructions that Mr. Ingrasselino falsely report to HR, if asked, that he only worked seven hours per workday when, in reality, he routinely worked 80 to 100 or more hours per week.

17.    MSG terminated Mr. Ingrasselino on February 20, 2024, in clear retaliation and further discrimination for his protected categories and activities, as further recounted in detail below. This Complaint sets forth the factual and legal basis for Mr. Ingrasselino's claims, highlighting the egregious nature of Defendant's actions, and the significant impact on his professional and personal life.

18.    Plaintiff seeks damages sustained as a result of Defendants' unlawful conduct in an amount to be proven at trial, as well as punitive damages, attorneys' fees and costs, a tax offset, interest, and other relief, as available under applicable law.

## JURISDICTION AND VENUE

19.    This Court has subject matter jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1332, in that it is involves an amount in controversy in excess of $75,000, exclusive of interest and costs, and is between citizens of different states.

20.    This Court has personal jurisdiction over Defendants because (i) MSG maintains an office and a significant business presence in the state and city of New York; (ii) MSG and John Eversole transacted business within the state of New York; and (iii) Plaintiff's claims arise out of or relate to Defendants' aforementioned contacts with the state and city of New York.

21.    Venue is proper in this district by virtue of 28 U.S.C. §§ 1391(b) and (c), because this is the judicial district in which a substantial part of the events or omissions giving rise to the claims occurred, and because Defendants are subject to personal jurisdiction within the district.

## PARTIES

22.    Plaintiff Donald Ingrasselino is an individual who, at all relevant times, resided in the state of New Jersey.  At all relevant times, Mr. Ingrasselino was a "person" and an "employee" of the Company working in its New York Office and entitled to protection by the relevant state and city laws referenced herein.

23.    At all times during his employment at MSG, Plaintiff worked in the Company's New York City office, located at 2 Pennsylvania Plaza, New York, New York 10121.

24.     Defendant MSG is a Company organized and existing under the laws of Nevada, having its principal place of business at 2 Pennsylvania Plaza, New York, New York 10121.[1]

25.     At all times relevant to the allegations herein, the Company was an "employer" as defined under applicable laws.

26.     At all times relevant to the allegations herein, MSG employed more than 5,000 individuals.

27.     At all times relevant to the allegations herein, Defendant John Eversole worked, resided in, and was a citizen of the state of New York, and was Plaintiff's sole supervisor with authority over the terms and conditions of his employment.

## PROCEDURAL PREREQUISITES

28.     Plaintiff is serving a copy of this Complaint upon the New York City Commission on Human Rights and the Office of the Corporation Counsel of the City of New York within the allotted timeframe, thereby satisfying the notice requirements of Section 8-502 of the NYCHRL.

29.     Plaintiff is serving a copy of this Complaint upon the New York Attorney General in compliance Section 215(2)(b) of the New York Labor Law.

## FACTUAL ALLEGATIONS

### A.     Mr. Ingrasselino's Background

30.     Mr. Ingrasselino has over twenty-nine years of experience in security and law enforcement, where he has amassed vast skillsets in connection with developing security protocols, protective services, investigations, and threat management.  Prior to joining MSG, Mr. Ingrasselino had a well-established career as a detective first grade with the Bergen County Prosecutor's Office

---

[1]     At the time of Mr. Ingrasselino's employment with the Company, MSG was organized and existing under the laws of Delaware, and recently officially changed its state of incorporation to Nevada.

in New Jersey from 2000-2018. Prior to this role, he was an enforcement agent with the U.S. Department of Justice from 1998 to 2000, assigned in New Jersey. During his time as a detective, Mr. Ingrasselino also held assignments as a task force officer with the Drug Enforcement Administration and the Federal Bureau of Investigations, earning him an industry-wide reputation for being hardworking, skilled, and trustworthy. Mr. Ingrasselino has an established track record of efficiently and effectively overseeing teams, providing strategic leadership and guidance, and developing all aspects of corporate and personal security. In August 2021, Mr. Ingrasselino applied for and was interviewed and hired by Vice President of MSG and TAO Group Hospitality ("TAO") Security Matt German and MSG Senior Vice President Darren Claphan to work for MSG as the Senior Director of Security for TAO, which was owned by MSG at that time.

31.    Until April 2023, Mr. Ingrasselino directly reported to Mr. German, under whose management Mr. Ingrasselino's role expanded. In April 2023, MSG sold TAO to Mohari Investment Group, and Mr. Ingrasselino continued working directly for TAO until August 2023. In September 2023, Mr. Ingrasselino was contacted by John Eversole, Executive Vice President and Chief Security Officer at MSG, and was asked by him to return to MSG as Vice President of Shared Security Services, reporting directly to him. During his tenure with both MSG and TAO, including during the five months that he worked directly for Mr. Eversole until his termination, Mr. Ingrasselino was a model employee who always performed excellent work, despite, as describe below, his employer refusing his requests to provide him with a job description and protocols.

32.    Mr. Ingrasselino repeatedly received praise from MSG Threat Management leadership and other employees for his hard work and dedication, and for his accomplishments in creating the global TAO Security program. His colleagues were also aware of and supported his

attempts to implement change in the MSG Threat Management Security Operations team which, prior to his arrival, had been directionless and lacked oversight.

33.     In 2022, TAO/MSG awarded Mr. Ingrasselino a 12% bonus, even though he was only allotted a 10% discretionary bonus in his agreement, indicating that the companies were especially satisfied with his high-quality work.  That MSG recognized Mr. Ingrasselino's value as an employee is demonstrated by its decision to employ him after it sold TAO, and to promote him to Vice President of Shared Security Services.

**B.     Mr. Ingrasselino Was Discriminated Against Based on His Disabilities and Age, and Subjected to a Hostile Work Environment**

**1.  *Mr. Eversole Discriminated Against Mr. Ingrasselino Based on His Disabilities***

34.     Mr. Ingrasselino is 49 years old and suffers from Type 1 diabetes, an autoimmune condition where the pancreas's insulin-producing cells have been attacked and destroyed by the immune system.  Type 1 diabetics need to carefully monitor what they eat to avoid causing spikes in their blood sugar level, which requires them to balance their sugar intake with regular doses of insulin.

35.     Mr. Ingrasselino did not generally disclose his condition, but would share it only if he needed to inject insulin in front of a co-worker due to spikes in his blood sugar levels, or if he were questioned about it directly.  As discussed below, those spikes were at times caused by stress, and during the five months Mr. Ingrasselino worked directly for Mr. Eversole at MSG, such instances increased dramatically.

36.     Defendants were not aware of Mr. Ingrasselino's disabilities prior to hiring him in 2023.  Mr. Ingrasselino reluctantly disclosed his disabilities to Mr. Eversole after he began working for him in October 2023.  Specifically, in or around November 2023, Mr. Ingrasselino attempted

to take a sick day off from work to attend his endocrinologist appointment. Mr. Eversole called Mr. Ingrasselino while he was in his office conducting a team meeting and, in the presence of Mr. Eversole's executive assistant, Danielle Rice, began questioning Mr. Ingrasselino regarding why he needs to see a doctor, stating "you seem to always be sick, is this something I have to look into?" Thus, Mr. Ingrasselino had no choice but to respond to Mr. Eversole's aggressive probing and disclose his Type 1 diabetes.

37.    Further, Mr. Eversole also stated that to request a sick day, Mr. Ingrasselino had to actually be sick and that a doctor's appointment does not qualify. Mr. Ingrasselino informed Mr. Eversole that he believed this was untrue and that a doctors' appointment was in fact a reasonable cause to qualify for a sick day, which was corroborated by Mr. Eversole's executive assistant. After the tense discussion with Mr. Eversole (which, again, took place in the presence of his executive assistant) Mr. Ingrasselino consulted the Company handbook to verify whether Mr. Eversole's assertion had any merit and, upon doing so, was unable to find anything to substantiate Mr. Eversole's claim.

38.    Still, Mr. Eversole refused to approve Mr. Ingrasselino's accommodation request for a medically necessary day off, stating that he would himself need to review MSG's policy. Mr. Eversole only approved his request several hours later after Mr. Ingrasselino, concerned that Mr. Eversole would continue to remain hostile to his simple request for time off, put significant effort into attempting to reschedule his appointment with his endocrinologist. From that point on, Mr. Ingrasselino was so apprehensive of taking any time off for his health out of fear of Mr. Eversole's hostility and retaliation that he only scheduled virtual appointments with his doctors, which were much less effective than an in-person examination. He accepted this reduced care to avoid the extreme stress of dealing with Mr. Eversole.

39.     After learning of Mr. Ingrasselino's disability, Mr. Eversole would openly mock Mr. Ingrasselino in front of his colleagues for suffering from this condition, ***informing them that Mr. Ingrasselino is "sick" and would "die if he eats sugar [because] he's weak."*** Often, Mr. Eversole would do so while laughing at the expense of Mr. Ingrasselino's illness in front of coworkers.  Mr. Ingrasselino's coworkers informed him that they only knew of his condition from Mr. Eversole's statements.   In further humiliation of Mr. Ingrasselino, ***Mr. Eversole would deliberately bring in cakes and pastries for the entire Threat Management team, specifically leaving them outside of Mr. Ingrasselino's office, even though there was a nearby kitchen, only to laugh and taunt Mr. Ingrasselino in front of his coworkers for not being able to eat them because he is "sick."***

40.     To cope with Mr. Eversole's public attacks on him, Mr. Ingrasselino would often remain in his office to avoid having to hear the outrageous and discriminatory remarks, and to prevent himself from engaging with the deliberate infliction of emotional distress upon him.  Mr. Eversole's unlawful disclosure of Mr. Ingrasselino's condition and public mockery and humiliation of him isolated him from his colleagues and diminished the authority he commanded over his direct reports.

41.     Mr. Eversole's discriminatory conduct toward Mr. Ingrasselino based on his disabilities is supported in how Mr. Eversole also targeted other individuals based on their having to take time away from work to address a disability.  In one instance, during a meeting in Mr. Eversole's office, Mr. Eversole specifically made it known to his leadership team, including Mr. Ingrasselino, that he was annoyed when a former employee, Ian Mitchell, requested to work from home so that he could help care for his sick child, and openly discussed how he had decided to "phase out" this employee due to his personal policy of not allowing employees to work from

home, despite MSG's Work From Home policy permitting it. Notably, the employee was threatened with termination and given three months to find a new position prior to such dismissal taking effect, even though Mr. Ingrasselino and all other management believed the employee's performance to have been exemplary, with great leadership skills.

42.     Mr. Eversole's pattern of hostility, open disdain, and blatant discrimination of Mr. Ingrasselino on account of his disabilities exacerbated Mr. Ingrasselino's condition and caused Mr. Ingrasselino additional stress and physical harm. Mr. Ingrasselino's physical and mental health began to rapidly deteriorate after he began his role as Vice President of Shared Security Services under the supervision of Mr. Eversole. As part of the regimen established by his doctors for monitoring his diabetes, Mr. Ingrasselino must consistently get blood work done. After years of effective management of his condition and steady levels, Mr. Ingrasselino's blood sugar levels became increasingly more variable and outside of his normal levels, reaching an all-time high A1C level of 9.3%. As a result of the discriminatory and hostile actions undertaken by Mr. Eversole, as recounted above and below, Mr. Ingrasselino's health declined to an all-time low.

43.     In December 2023, as another manifestation of the work-related stress caused by Mr. Eversole's unlawful actions, Mr. Ingrasselino developed a face rash that resulted in peeling skin. Mr. Ingrasselino was embarrassed by the rash and tried to treat it as best he could without success. He requested a day off to seek medical treatment, which Mr. Eversole (as expected) denied, claiming that he needed Mr. Ingrasselino in the office. Left with no other choice but to comply with Mr. Eversole's demand, Mr. Ingrasselino presented himself to the office only to immediately be asked by Mr. Eversole what is "wrong" with him and told that he looks "disgusting." Mr. Eversole was aggressive and acted without empathy for what any reasonable person would perceive as a concerning and uncomfortable condition. He berated Mr. Ingrasselino,

asking him "How can I put you in front of Dolan this way?" (referencing James Dolan, the Executive Chairman and CEO of MSG). When Mr. Ingrasselino replied that he had requested a day off for this very reason, Mr. Eversole proceeded to mock him and continued doing so for the following two weeks, disgustingly "joking" about his condition to others.

### 2.  *Mr. Eversole Discriminated Against Mr. Ingrasselino Based on His Age*

44.     When Mr. Ingrasselino first joined MSG as Senior Director of Security for TAO in 2021, it became apparent to him that Mr. Eversole explicitly factored age into his employment criteria. Mr. Ingrasselino learned this when he was asked by his supervisor at the time, Matt German, to look into hiring three directors who would work alongside and under Mr. Ingrasselino to build the security program. Mr. Ingrasselino dedicated extensive efforts to advertising the role and interviewed several individuals. One individual who particularly stood out to Mr. Ingrasselino was Terence McCabe, whom he recommended to Mr. German. Despite being very well qualified, Mr. German informed Mr. Ingrasselino that Mr. Eversole, who supervised Mr. German, had decided not to hire Mr. McCabe because he was "too old" (on information and belief, Mr. McCabe was in his mid-50s). As such, Mr. Ingrasselino was prevented from hiring the candidate he thought was most qualified solely due to Mr. Eversole's blatant age discrimination. Soon enough, upon accepting the position to work as Vice President at MSG and working directly under Mr. Eversole, Mr. Ingrasselino, who is 49 years old, would experience Mr. Eversole's similar discriminatory animus himself.

45.     Soon after returning to MSG after TAO was sold off, Mr. Ingrasselino began working more directly with his new supervisor, Mr. Eversole, who would subject him to a series of demeaning, hostile, and humiliating actions based on Mr. Ingrasselino's age.

46.     Merely two weeks into his new role at MSG, Mr. Ingrasselino sought clarification from Mr. Eversole regarding what the expectation for his daily schedule was as he had not been provided with a job description outlining his role.  Mr. Eversole then responded that he expects his vice presidents to arrive at the office at 10:00 a.m., and they would only be dismissed when he decreed so, stating "You stay until I don't need you anymore.  This is not a 40-hour-a-week job, don't make me fire you."  Mr. Ingrasselino, although shocked at the hostility and aggression Mr. Eversole had displayed at what was a simple and reasonable inquiry, respected his directive and began arriving at the office at 10:00 a.m.  However, Mr. Eversole would often call him between 9:00 and 9:30 a.m. demanding that Mr. Ingrasselino immediately present himself to the office (early) for no apparent reason.  When Mr. Ingrasselino would convey that he is en route to the office, Mr. Eversole would begin yelling and threatening Mr. Ingrasselino with writing him up or terminating him for being late when, in fact, he was not late by the start-time Mr. Eversole himself had imposed and never changed.  On one occasion, Mr. Eversole texted Mr. Ingrasselino at 9:15 a.m. demanding that he arrive at the office immediately.  Once Mr. Ingrasselino arrived (prior to his 10:00 a.m. start time), Mr. Eversole claimed that he was late and, although the comment did not pose any logical connection with respect to Mr. Ingrasselino's arrival time, *Mr. Eversole crudely remarked, "This is why I need to stop hiring old guys."*

47.     After this encounter, Mr. Ingrasselino, fearful of Mr. Eversole's temper and retribution for what he wrongly perceived as tardiness, began arriving at work between 9:15 and 9:45 a.m.  Despite arriving earlier than he was initially told to, Mr. Ingrasselino was also forced to work later than usual as Mr. Eversole would often set "traps" for him by texting or calling him after 6:30 p.m. solely to ensure that Mr. Ingrasselino was still at the office and available.

48.    Still, despite his best efforts to meet the impossible and irrational standards imposed by Mr. Eversole, Mr. Ingrasselino continued to be demeaned, yelled at, and insulted by Mr. Eversole, even to the extent Mr. Ingrasselino began to fear Mr. Eversole, who carried a gun to the office, would physically attack him.

49.    On numerous occasions over the phone, in the office, during team meetings, and in the presence of guests, ***Mr. Eversole would scold and harass Mr. Ingrasselino, often referring to him with reference to his age as "another old retired cop."*** Mr. Eversole's aggression and hostility did not go unnoticed, as Mr. Ingrasselino's colleagues would often approach him to express their sympathy for how Mr. Eversole had treated him, often stating "you are the target now."

50.    Another specific example of discriminatory offensive comments occurred when Mr. Ingrasselino allowed two of his direct reports to request time off on the same day, which, to be clear, is not against any policy imposed by MSG.  Although Mr. Ingrasselino, in his capacity as Vice President and team leader, had already ensured adequate coverage for that day, Mr. Eversole sought to demean Mr. Ingrasselino by not only baselessly accusing him of not knowing how to lead his team, but calling him an ***"old failure"*** and a "waste" for causing what he (Mr. Eversole) perceived to be an egregious policy violation.  When Mr. Ingrasselino stated that he was not aware of such policy at MSG, Mr. Eversole retorted that, "It's my policy and it's clear you are not getting me.  I make this policy, and you work for me."  In addition to enduring the hostile commentary, despite having done no wrong, Mr. Ingrasselino was forced to cancel the time off he had previously approved for his direct reports, thereby diminishing his authority and capability in front of his team.

51.     Another example of Mr. Eversole's clearly discriminatory conduct occurred during a travel detail to Canada, when Mr. Ingrasselino was assigned to meet with Mr. Eversole and James Dolan, to prepare and advance safety logistics for their travel by private jet to a hockey event.  Mr. Ingrasselino ensured that every aspect of the trip was secured and ready for the arrival of Mr. Dolan and Mr. Eversole.  As is customary for travel by private jet, Mr. Ingrasselino was aware that the flight team had allocated approximately half an hour of time for Canadian customs to clear the flight.  From the landing, to clearing customs, to entering the car, and departing the airstrip, Mr. Ingrasselino had diligently and expeditiously cut down the time for the entire process, including customs, from what might have typically been 45 minutes, to only 26 minutes.  However, rather than have his efficiency be praised or rewarded, ***Mr. Eversole*** instead called him several times to berate him for not having completed the process even faster, ***claiming that a younger man would have accomplished the same in 15 minutes***.

52.     Once Mr. Dolan and Mr. Eversole arrived at the hockey event, Mr. Ingrasselino informed Mr. Eversole that, having confirmed their safe arrival, he had to depart to the airport for his flight back home, as per Company policy.  Mr. Eversole, in an attempt to punish Mr. Ingrasselino for not being young or fast enough to meet his discriminatory standards forced Mr. Ingrasselino to miss his flight and remain overnight in Canada.  Mr. Eversole did so by instructing Mr. Ingrasselino to pick up for Mr. Eversole and another colleague, Vice President Jeremy Watkins, food from McDonald's.  Mr. Eversole's menial task assignment to Mr. Ingrasselino, a Vice President at MSG, requiring him to fetch food was another blatant attempt by Mr. Eversole to humiliate Mr. Ingrasselino for what appeared to be his own entertainment.  Mr. Eversole actually stated that he was punishing Mr. Ingrasselino because Canadian customs took longer than he would have liked, and proceeded to mock Mr. Ingrasselino, whom Mr. Eversole insisted should stay by

his side, in front of other event attendees throughout the night by physically poking him in his chest, swiping his phone from his hands, and pretending to strike him in his testicles to make him flinch. Mr. Ingrasselino was then forced to find a hotel and book another flight, incurring unnecessary additional expenses for MSG and personal expenses, entirely due to Mr. Eversole's desire to torment him.

53. Such behavior and hostility from Mr. Eversole became commonplace. In addition to insulting Mr. Ingrasselino's appearance, ***Mr. Eversole would continuously refer to him as "old" and "ugly" (e.g., "You are an old ugly man")*** and claimed that he (Mr. Eversole), was more successful than Mr. Ingrasselino despite being younger than Mr. Ingrasselino.

54. On January 31, 2024, a female MSG employee left the office and was assaulted, without injury, by an unidentified man in Pennsylvania Station. She filed a report with the police and then returned to the office and informed the security supervisor, Chris Yanez, of her assault and asked him for assistance with getting on the train safely. According to MSG Threat Management policy, Mr. Yanez was obligated to inform his supervisor, Director Brian Conroy, and Mr. Ingrasselino of the incident immediately, which he failed to do. The following day, the female employee informed her director of the assault, who then reported it to MSG'S Human Resources group. Still unbeknownst to Mr. Ingrasselino, Human Resources spoke with the female employee, and, on information and belief, the situation was addressed and handled appropriately.

55. On February 2, 2024, Darian Jennings from MSG's Human Resources sent Mr. Ingrasselino and Cameron Watkins, the Director of Investigations, who was Mr. Ingrasselino's direct report, an email at 8:48 a.m. informing them of the situation for the first time. The email did not require any action from Mr. Ingrasselino or Mr. Watkins. Mr. Ingrasselino learned that Mr. Eversole was made aware of the situation though an email that was similarly intended to be

strictly informational.  While the email to Mr. Ingrasselino was sent before Mr. Ingrasselino was

expected to begin work, he had begun working early from home that morning to meet a deadline

prior to going to the office.  Mr. Eversole required that any urgent matters be communicated via

text or telephone call, and he himself scolded employees who emailed him rather than called him

for matters that required a response.  Mr. Ingrasselino's staff was also aware that time sensitive or

urgent communications should be transmitted to him via text or telephone call, which they did

(and which, per Mr. Eversole's requirements, Mr. Ingrasselino would respond to promptly).  Mr.

Ingrasselino did not typically receive many emails, let alone urgent emails.  As such, Mr.

Ingrasselino typically checked work emails every one to two hours after the start of his day.  That

morning, Mr. Ingrasselino checked his email when he woke up around 8:00 a.m. and then began

work at home.  As such, he did not see the email until later in the morning, prior to leaving for the

office.  Mr. Eversole called him, having seen the email sent directly to him and, when Mr.

Ingrasselino told him that he had not yet seen the email due to diligently completing other time

sensitive assignments, Mr. Eversole proceeded to yell and curse at Mr. Ingrasselino for his

supposed oversight, telling him that he was writing Mr. Ingrasselino up for a "final warning."  At

no point prior to this discussion had Mr. Ingrasselino been issued any warning (as there had never

been an instance where he warranted one) despite all of Mr. Eversole's belligerent behavior.

56.     Mr. Ingrasselino, shocked at the sudden onslaught and threat, apologized and

inquired on the call as to why he was being written up for simply not seeing an informational email

sent prior to his work hours.  Despite apologizing for what was not an actual error on his part, *Mr.

Eversole continued his verbal assault and stated, "If you are too old to handle this level of work,

I will fire you immediately for this and find someone else who is capable."*  Mr. Ingrasselino's

neighbor, Fiona Rooney, who was in his apartment that morning, overheard the exchange.

57.     In response to Mr. Eversole's comment, Mr. Ingrasselino asked Mr. Eversole if he was serious, and Mr. Eversole hung up the phone.  Mr. Eversole's unfounded attack on Mr. Ingrasselino on account of his age – despite the fact that his age had nothing to do with his not seeing the email sooner – and Mr. Eversole's implied threat to replace him with someone younger is clear discriminatory animus.

58.     Now that he was aware of the incident regarding the assault on the female employee, despite the jarring manner in which he learned of it, Mr. Ingrasselino spoke with the Director of Investigations and Human Resources to reconfirm that no further action was needed, only to be told, as he previously understood, that the situation had been dealt with and the female employee was offered assistance.  Mr. Ingrasselino also took matters a step further and directly spoke with the female employee, who informed him of everything that had happened and how the building's security had known about the assault mere minutes after it happened, days earlier.  She further explained that she only informed her director as a cautionary tale in case it happened to others and was not looking for any further response or action.  This was the first time Mr. Ingrasselino had a full picture of what had happened, including how the matter was handled internally.

59.     Shortly after meeting with the employee, Mr. Ingrasselino received a meeting request to join Mr. Eversole and Human Resources, where he was informed that, as Mr. Eversole had threatened, he was being given a final warning (despite no prior warnings) for allegedly not relaying information in a timely manner.  Despite the clear pretextual nature of the claim, Mr. Ingrasselino again apologized for not seeing the email earlier and shared that he had implemented steps in connection with his email notifications to ensure that it would not happen again (which he had done).  By all accounts, Mr. Ingrasselino handled this situation in an exemplary manner, going

as far as addressing all the parties involved (the Director of Investigations, Human Resources, and the female employee) and implementing proactive measures to prevent such a situation from occurring again, despite there being zero negative effect in his delayed review of the email.  In a surprising turn, Mr. Eversole stated during the meeting – presumably due to his desire not to blatantly target Mr. Ingrasselino based on his age in front of the Human Resources Director – that Mr. Ingrasselino was great at his job and that he could keep his position.  However, such a slight concession on the part of Mr. Eversole does nothing to undo the months of torment he had inflicted upon Mr. Ingrasselino, though it accurately reflects what an invaluable and model employee Mr. Ingrasselino was.

60.    After the meeting, Mr. Eversole changed the initial "final" warning to a non-final one, stating to Mr. Ingrasselino that, "I wanted to teach you a lesson."  However, the write-up contained false and misleading information, such as claiming that Mr. Ingrasselino had withheld information from his manager, Mr. Eversole, when in fact he had done no such thing.  When Glenn Macapagal, Senior Director of People Practices and acting in a human resources capacity, asked Mr. Ingrasselino to sign the write-up, Mr. Ingrasselino voiced his concerns that it was inaccurate and designed to claim that Mr. Ingrasselino had somehow violated Company policy.  Mr. Macapagal pressured Mr. Ingrasselino to sign the form, claiming it was not a "big deal" and it was in his best interest to sign it.  Out of fear of further retribution and harassment from Mr. Eversole, and of the veiled threat Mr. Macpagal had conveyed, Mr. Ingrasselino was pressured to sign the write-up.

61.    After the meeting, on the following Monday, to be even more proactive, Mr. Ingrasselino asked Mr. Eversole what the expectation was for responding to emails in a timely manner, to which Mr. Eversole replied that Mr. Ingrasselino must be available to him 24/7, 365

days a year as that is his standard and expectation.  In yet another outrageous and illegal display,
**_Mr. Eversole once again attacked Mr. Ingrasselino for his age, stating "Can you keep up with that at your age?"_**

62.     Mr. Ingrasselino then met with Chris Yanez, the security supervisor who first learned of the female employee's assault, and found out that he, unlike Mr. Ingrasselino, had not been spoken to nor reprimanded for failing to follow policy and procedure to report the incident. Mr. Ingrasselino also spoke with Senior Vice President, Darren Claphan, and asked if he believed Mr. Ingrasselino was being targeted and if he should start looking for another job because he was being forced out.  Mr. Claphan replied that "In my experience, John [Eversole] is targeting you and you should start looking because that's what he does."  This statement rang true to Mr. Ingrasselino, who believed that he was being targeted due to his age and disabilities, as well as whistleblower complaints, as discussed below.  Mr. Ingrasselino also asked Senior Vice President Claphan if Mr. Yanez would be reprimanded, only to be informed that he had handled it but that "nothing is going to happen to him, John likes him."  Clearly, Mr. Eversole favored those who fit his image of a young and vibrant staff in the protection group at MSG – like Mr. Yanez who, on information and belief, is in his mid-30s – in contrast with Mr. Ingrasselino, who was older and did not fit that mold, and who was chastised with bogus pretextual claims of wrongs, humiliated, excessively disciplined, and discriminated against.

63.     Further, Mr. Claphan accurately stated that, although unfortunate it happened, the female employee was in fact assaulted after work hours and outside of MSG property.  While it is understandable how the female employee would have sought support from her colleagues in dealing with the assault, Mr. Claphan added that he failed to see how Mr. Ingrasselino could be held responsible for such an incident or what action he should have taken.  Mr. Eversole imposed

an impossible and illogical standard on Mr. Ingrasselino designed to set him up for failure by faulting him for an assault of an MSG employee that occurred outside of the office and the scope of their employment.

### C.    MSG Retaliated Against Mr. Ingrasselino After He Reported Illegal, Wrongful, and Unsafe Activity at the Company

64.    During his employment, Mr. Ingrasselino witnessed several business and individual practices he believed to be illegal and which posed a danger to public health or safety, as well as being unethical and in violation of Company policy.  The wrongful practices went against what Mr. Ingrasselino believes in and struck at the heart of his work ethic, which is to operate with integrity.

### 1.    *Mr. Ingrasselino Opposed Defendants' Instructions for MSG Threat Management Employees to Take Dangerous Actions for Which They and MSG Had No Legal Authority*

65.    Mr. Ingrasselino frequently raised issues about his and his direct reports' job descriptions, which seemingly did not exist.  In Mr. Ingrasselino's line of work, a clear job description is vital to ensure that all team members were aware of their responsibilities, expectations, and the tasks they were to handle, particularly with respect to navigating potentially dangerous conditions.  Mr. Eversole, in contrast, operated in an ad hoc and disorganized manner, giving directives that were ambiguous and risky, leaving Mr. Ingrasselino and his team vulnerable to potentially being injured on the job or being subjected to possible third-party liability.  As his direct reports expressed their concerns, Mr. Ingrasselino attempted to create and implement standard operating procedures that would protect his team from harm and liability.  For example, Mr. Ingrasselino sought to put into place protocols that would prevent his subordinates from needlessly going into harm's way.  Mr. Eversole, on the other hand, ordered Mr. Ingrasselino's

team to chase criminals, scalpers, and homeless individuals without training or procedures. Mr. Eversole also instructed employees to imbed themselves in other risky situations like riots and protests that were unrelated to MSG. Mr. Ingrasselino would often voice his objections to these instructions to the MSG Threat Management leadership with respect to these instructions, which not only gave rise to safety concerns but required employees to act outside the scope of their employment.

66.    By way of example, Mr. Ingrasselino and his team were forced by Mr. Eversole's directives – which Mr. Ingrasselino believed to conflict with MSG's standard policies and workplace laws intended to keep employees safe and out of unnecessary danger – to imbed themselves in the middle of pro-Palestine or anti-Israel protests and riots, without proper equipment like radios for communication, sufficient direction or planning, and law enforcement back up. Similarly, Mr. Ingrasselino's direct reports were tasked by Mr. Eversole to remove scalpers and drug dealers without back up, communication, or assistance from MSG venue security or NYPD paid detail. In fact, Mr. Eversole instructed the team to remove such dangerous individuals in situations that would often erupt into aggressive and often threatening encounters with these criminals both on and outside of MSG property. Even though some of these individuals placed themselves outside the MSG property lines, Mr. Eversole still demanded that Mr. Ingrasselino's team remove them despite MSG lacking the legal authority to do so.

67.    ***Mr. Ingrasselino would often advise and caution Mr. Eversole that his team did not possess the legal authority to take action outside of MSG's jurisdiction, but Mr. Eversole paid him no heed.*** Along with Mr. Ingrasselino's complaints, Investigator Beatriz Solorzano, who is a woman with a smaller frame, would often voice her concern and fear of these directives. Mr. Ingrasselino agreed with Ms. Solorzano's safety concerns and attempted to modify Mr. Eversole's

orders.  ***Mr. Ingrasselino brought his concerns to the attention of Vice Presidents James Rivera and Brian Conroy, who served as MSG's Director of Intelligence, and numerous Senior Vice Presidents at MSG, including Mr. Claphan and Ryan Dupree, who both informed Mr. Ingrasselino that he should not raise his safety concerns with Mr. Eversole because that will get him and Ms. Solorzano fired.***

68.     Despite the warning, Mr. Ingrasselino, who considered the safety of his direct reports to be of the utmost importance, disregarded this directive and did raise his and Ms. Solorzano's safety concerns directly with Mr. Eversole.  However, Mr. Eversole refused to engage and ended the discussion by expressing anger at the thought of his directives not being obeyed.  Mr. Eversole informed Mr. Ingrasselino that if Ms. Solorzano could not do the job, Mr. Ingrasselino needed to fire her, even though the unsafe requirements imposed by Mr. Eversole fell outside the scope of Ms. Solorzano's role as an Investigator and what the law allowed MSG employees, as private citizens, to do.  Mr. Eversole then began targeting and retaliating against Ms. Solorzano by checking and monitoring her hours and work schedule and demanding that she be written up for purported violations.

69.      Mr. Ingrasselino not only informed Mr. Eversole of the unsafe and unnecessary directives, but also attempted to inform Vice President Azure-Dee Martin of Human Resources about the concern as recently as a few weeks prior to his termination.  However, Mr. Ingrasselino was informed by Mr. Eversole that he was not allowed to speak to Human Resources, stating to Mr. Ingrasselino "You work for me, and any issues you have you need to speak with me."

70.     Since Mr. Ingrasselino's termination, he was informed that at the end of June 2024, due to the failure of MSG to implement the safety measures of which he complained, and Mr. Eversole's unlawful directions for employees to interact with potentially dangerous individuals

wholly outside of the property and domain of MSG, without support from an NYPD paid detail, two MSG employees were attacked and suffered injuries. Specifically, Investigator Joe Doherty and Senior Director Brian Conroy were attacked by scalpers and sellers of fraudulent merchandise outside of MSG, resulting in Mr. Conroy's hospitalization. The blatant disregard of Mr. Ingrasselino's warnings about the importance of police detail and dangers of Mr. Eversole's directives for the Threat Management team to interfere with dangerous individuals wholly outside the scope of MSG and their employment, led to the very physical harm that Mr. Ingrasselino had sought to prevent.

### 2. Mr. Ingrasselino Complained About Defendants' Unlawful Requirements Pertaining to the Carrying and Use of Firearms by MSG Employees

71. Further, Mr. Ingrasselino was concerned that some of his direct reports were armed with firearms as part of their employment at MSG, per Mr. Eversole's direction, and were often placed in dangerous situations – such as forcing them to intercept ticket scalpers, homeless individuals, criminals and drug dealers – with little to no guidance as to when or if firearms could be used. While these employees were able to legally carry a firearm under the Law Enforcement Officers Safety Act (the "HR 218" or "LEOSA"), as qualified retired officers, Mr. Ingrasselino understood that the federal law does not grant them any enforcement authority. Rather, they are merely considered citizens with a nationwide concealed carry permit.

72. **Mr. Eversole's direction to employees to carry their weapons while serving as MSG security, was – as Mr. Ingrasselino believed during his employment for MSG and continues to believe – a circumvention of the law, which did not allow for use of a firearm to protect MSG and its goals, but was rather intended for defensive purposes.** Mr. Eversole's unlawful policy and expectation caused significant risk, liability, and uncertainty that the

employees would use the weapons in an offensive enforcement authority as part of their role in security at MSG, which Mr. Ingrasselino believed to be in violation of law. Despite this, Mr. Eversole never articulated or enforced any protocol regarding the lawful use of weapons.

73.     Mr. Ingrasselino himself is legally allowed to carry a firearm under HR 218, but chose not to as he had concerns that carrying a weapon posed a risk of putting him in a position where he would have to engage in the illegal use of it.

74.     In contrast, Mr. Eversole would often visibly and openly carry his own firearm on his belt or shoulder throughout the office in a manner intended to intimidate people. *Upon witnessing this, Mr. Ingrasselino believed (and continues to believe) that Mr. Eversole's conduct violated the intent and limitations of HR 218, and would be illegal absent a New York license to carry a concealed weapon or to openly carry a firearm, which, on information and belief, Mr. Eversole did not possess.*

75.     Employees of MSG would often express their fears and concerns to Mr. Ingrasselino regarding Mr. Eversole's open display of his gun. *In December 2023, Mr. Ingrasselino told Mr. Eversole that he did not feel comfortable carrying a firearm in acting in an enforcement capacity for MSG's benefit. He further discussed this matter with his direct reports and others who were authorized through HR 218 to carry weapons. Mr. Ingrasselino requested from Mr. Eversole and Senior Vice Presidents that he be allowed to put in writing clear standards and guidelines for his team's protection and to comply with the law. His warnings and complaints were ignored, and his request for a written policy was denied.* Since Mr. Ingrasselino's termination, he has become aware of many other former and current employees who expressed similar feelings of intimidation and lack of safety due to Mr. Eversole's illegal

open carrying of a gun in connection with his job, with some referring to Mr. Eversole's firearm carrying as "unhinged," "scary," and "menacing."

### 3. Mr. Ingrasselino Complained About Defendants' Instructions and Related Actions Seeking to Invade the Privacy of Private Citizens Without Legitimate Business or Safety Reason

76.     Mr. Ingrasselino also complained about another activity he was required to perform which he did not believe was legal.  *He was often ordered to do full and intrusive background checks, surveillance, and assessments into individuals' backgrounds who were of no threat to MSG itself, but were personal enemies of Mr. Eversole or James Dolan.  Mr. Ingrasselino did not believe it was lawful for him to violate these individuals' privacy for what he understood to be no legitimate business reason or safety concern, and doing so made him feel uncomfortable. He often asked for clarity on what Mr. Eversole was looking for and whether they could scale back the intrusiveness of the background checks*.  On every occasion, he was shut down by Mr. Eversole, not given any additional context, and told to continue the background checks on the personal enemies of the Executive Vice President and CEO of the Company.  Mr. Ingrasselino complained to his coworkers and other leaders that this practice created liability where it targeted those who were no threat to MSG and was performed outside of MSG's jurisdictional limits. Amongst others, Mr. Ingrasselino is aware that MSG used the practice against guests, customers, law firms, lawyers, and sports fans who articulated frustration with team losses, chanted for Mr. Dolan to sell the Knicks, or simply used foul language.

77.     *Mr. Ingrasselino was also often tasked with oversight of insider "threat" investigations, where he would be ordered to conduct what he believed to be unethical and overreaching surveillance of MSG guests, vendors, customers, and employees that constituted unlawful invasions of privacy.*  Mr. Ingrasselino, as well as his direct reports, would often question

their assignments due to concerns about their legality and intrusive nature.  When Mr. Ingrasselino would do so to Mr. Eversole, he would be yelled at, told to stop asking questions, and instructed to obey his orders.  For some individuals, Mr. Ingrasselino would be forced to compile personal, criminal, and financial backgrounds of the subject, including photographs of the individual and their family members, their social security number, contact information, tax information, social media profiles, work and family history, and driving records.  ***Mr. Ingrasselino consistently and repeatedly voiced his concerns over the blatant and unjustified invasion of these individuals' privacy for what appeared to be no legitimate business reason, not only to Mr. Eversole, but to his team, the intelligence team, and other senior leadership, including Intelligence Director Lauren Wyngant, Information Security Director Brandon Slaska, Vice President of Investigations and Security Intelligence Todd Jackson, Director of Intelligence Brian Conroy, Vice President of Security James Rivera, Senior Vice President of Security and Aviation Darren Claphan, and his direct reports.***  He was especially concerned by the fact that MSG had no standard operating procedures for the storage and dissemination of this highly sensitive information, and that MSG employees would often send the information through apps and Signal Chats that had numerous users added, at least some of whom had no need to see this sensitive data. Despite the gravity of his concerns, Mr. Ingrasselino's complaints were ignored, and as previously discussed, he was reprimanded for voicing his concerns and told to follow orders.

78.    An example of Mr. Eversole's directives that Mr. Ingrasselino believed to be far reaching, unethical, and illegal occurred on January 16, 2024.  Several news articles were released regarding litigation relating to MSG Chairman James Dolan and a sexual abuse allegation.  Mr. Eversole directed Mr. Claphan, Mr. Dupree, and Mr. Ingrasselino to meet urgently in his office. At the meeting, Mr. Eversole informed Mr. Ingrasselino and Mr. Dupree of the allegations and

immediately asked them to find methods to secretly tape conversations over cellular phones and find the ability to eavesdrop on the complainant/victim.  Mr. Dupree and Mr. Eversole discussed various methods of doing so, while Mr. Ingrasselino sat there and avoided engaging in this request.

79.    After they unsuccessfully searched for methods to perform these deceptive measures via different apps and Google searches, Mr. Eversole directed Mr. Ingrasselino and Mr. Dupree to go to B&H Electronics located at 420 9th Ave, New York, New York 10001, to purchase listening and recording devices for Mr. Eversole and Mr. Dolan.  Prior to leaving the office, Mr. Ingrasselino informed Mr. Eversole that they needed to be wary of potential witness tampering, to which Mr. Eversole responded, "Just get me the equipment and stop thinking."  Silenced yet again by Mr. Eversole, Mr. Ingrasselino and Mr. Dupree walked to the B&H location as ordered.  There, Mr. Dupree spoke with several store associates in the presence of Mr. Ingrasselino, where he informed the B&H employees that he needed the best equipment to tape and record someone without their knowledge.  Most of the employees could not assist with Mr. Dupree's ask, however, one employee offered several listening and recording device options, which Mr. Dupree selected and purchased, using his MSG corporate credit card.  While paying for the devices, the store required an email, telephone number, and customer name, which Mr. Dupree refused to supply and deceptively provided a fictitious name, phone number, and email address, even though his MSG corporate credit card contained the verifiable information.  Once back at the office, Mr. Ingrasselino, not willing to be part of this scheme any further, informed Mr. Eversole that he had a team meeting he needed to attend.

### 4. *Mr. Ingrasselino Complained About Defendants' Unlawful Use of Facial Recognition Software*

80.    In addition to MSG's unethical and illegal monitoring practices, as reported publicly, MSG used facial recognition technology to identify and prevent certain individuals from

entering MSG property, including lawyers suing the Company.  While MSG publicly claimed that its use of facial recognition software was intended to aid law enforcement, Mr. Ingrasselino understood this was not the case.  To the contrary, he believes that MSG's facial recognition has not aided law enforcement in any substantive manner and was never intended to do so.  Rather, the Company created an after-the-fact false narrative in an attempt to legitimize its practices, even uploading photographs from the FBI's "Most Wanted" list into its software, when in reality, the technology was used to bar individuals perceived by the Company, Mr. Dolan, and Mr. Eversole as personal "threats."

81.    ***Mr. Ingrasselino, who questioned the legality of MSG's use of the facial recognition technology based on his observations of its unlawful application, specifically indicated in December 2023 and January 2024 the need to revamp the program by creating clear standard operating procedures and policies.  Among other things, he inquired as to how MSG would handle a situation where a fugitive from the FBI's "Most Wanted" list was identified by the facial recognition software, such as who at MSG would notify the appropriate law enforcement authority and how it would specifically facilitate law enforcement's discrete entry to apprehend the individual.***  These reasonable and necessary questions were met with curt dismissals from Mr. Eversole, who refused to establish guidelines or adequately answer Mr. Ingrasselino's questions.  The response solidified Mr. Ingrasselino's belief that MSG had no genuine interest in aiding law enforcement, and the purported justification of its use of facial recognition was nothing more than pretext to carry out its mission of excluding private individuals the Company did not want entering its venues.

82.    Mr. Ingrasselino believes that Mr. Eversole sought to use the facial recognition software for discriminatory means, in violation of law.  Mr. Eversole directed Mr. Ingrasselino

and other leadership (including Scott Curtis, Adrienne Corson, Todd Jackson, Rod Williams, and Ty Munn) to closely monitor the activities of a transgender woman named "Mia," who was a friend to a number of Knicks players. Mr. Eversole appeared to believe that purported romantic or sexual intimate relationships with one or more of the professional athletes warranted placing Mia in MSG's facial recognition program, and directed team security personnel to "keep him or it or whatever it is away from the players" (with reference to Mia). Mr. Eversole would often produce a photograph of Mia during meetings and openly mock her with leadership and other management. Mr. Ingrasselino believed that Mr. Eversole targeted Mia because of her gender identity and not because she posed any type of legitimate threat to MSG or the Knicks, and Mr. Ingrasselino was not aware of Mr. Eversole taking any other similar adverse actions (*i.e.*, banning from the area or placing individuals in the facial recognition program) against others who socialized with athletes, including those who had extensive criminal histories and had the potential of posing a legitimate threat to MSG. On information and belief, Mr. Eversole believed that Mia's presence as an openly transgender woman could "damage MSG's reputation." On that basis, and further on information and belief, Mr. Eversole also fabricated a stalking allegation to justify banning Mia from MSG. Mr. Eversole then instructed Mr. Ingrasselino to enforce this ban by ensuring that she was not permitted to enter MSG properties.

5. ***Mr. Ingrasselino Complained About Safety Hazards Stemming from Defendants' Use of Faulty Security Technology and a Related Conflict of Interest that He Believed Led MSG to Ignore These Dangers***

83.     Mr. Ingrasselino also took issue with what he thought were fiduciary duty violations by Mr. Eversole in connection with efforts by him and another Threat Management employee, Darren Claphan, to close multimillion-dollar MSG deals with Xtract One Technologies, a company on whose Advisory Board Mr. Claphan served while simultaneously working for MSG.

Xtract One supplied new security technology to all MSG properties, such as weapons detection systems at all ingress and egress points of its venues, including the Sphere.  Mr. Ingrasselino and his team, as well as the Radio City Music Hall Security team, the Chicago Theater team, and the MSG team, believed that Xtract One Technologies was providing MSG exceedingly inferior technology compared to other companies in the market.  When speaking to Vice Presidents Jim Rivera, Ty Munn, and Chicago Theater's Director Andrew Smith about the ineffectiveness of the system, ***Mr. Ingrasselino voiced his concern of the conflict of interest he believed to exist with Mr. Claphan being on the Board and working for Xtract One.***  Messrs. Munn, Smith, and Rivera agreed, but informed Mr. Ingrasselino that they were told by Mr. Eversole and Mr. Claphan to not speak of it.  The systems' failures were causing delays at ingress points and large crowds to gather during the first several months of use, which at times were followed by Mr. Eversole or Mr. Dolan yelling and berating venue leadership in response, even though they were not responsible for the technology's deficiencies.

84.     ***Mr. Ingrasselino and his team were tasked with evaluating Xtract One's technology, including its weapons detection, and discovered that after only a few months, its failure rate (meaning its failure to detect unauthorized objects, including guns, knives, and other metallic items) was of approximately 70%.  Still, despite these findings and Mr. Ingrasselino expressly flagging concerns to his superior over the grave risks the inferior technology posed to MSG, its patrons, and public safety, Mr. Eversole and Mr. Claphan nonetheless together convinced MSG to continue deploying Xtract One's machines at all MSG properties – on information and belief, because of their own financial interests and investments in the company.  Mr. Ingrasselino was ordered by Mr. Eversole not to disclose the technology***

*failures he had uncovered, and that any notes he had reflecting such findings be sent only to Mr. Eversole.*

85.    This cover-up deeply concerned Mr. Ingrasselino, both because of the conflict of interest and significant risk to public safety in deploying a system that failed to detect dangerous weapons despite being implemented for that very purpose, and because the failures appeared to him to directly violate National Hockey League and National Basketball Association security protocols with which MSG was required to comply.  Indeed, MSG had to continue utilizing its old technology because the new Xtract One systems were faulty, unreliable, and incapable of operating on their own to ensure the safety of the venues and guests.  On information and belief, both Mr. Eversole and Mr. Claphan benefitted financially from this relationship with Xtract One at the detriment and risk of MSG and the safety of its guests, further heightening Mr. Ingrasselino's concerns regarding the conflict of interest and the resulting harm.

### 6. *Mr. Ingrasselino Complained About Mr. Eversole's Discriminatory Treatment Against Female MSG Employees*

86.    *Mr. Ingrasselino also complained about Mr. Eversole's unlawful discrimination against women employed by MSG.*  During his first few weeks upon returning to MSG, Mr. Ingrasselino witnessed how Mr. Eversole was targeting two female members of the Intelligence team, Leslie Fluger and Megan Howard.  Mr. Eversole had previously ordered Mr. Ingrasselino to avoid interacting with them as they are, to quote Mr. Eversole, "toxic and crazy" and "crazy bitches."  Mr. Ingrasselino is far from the only person who heard Mr. Eversole refer to females on the MSG "intel" team as "crazy bitches."   In addition to other employees, Mr. Ingrasselino's neighbor, who was visiting him one time when he was on the phone with Mr. Eversole, overheard Mr. Eversole use the offensive terminology in referring to Mr. Ingrasselino's colleagues.

87.    Mr. Eversole told Mr. Ingrasselino that he had wanted to fire Mr. Ingrasselino's predecessor in the role, Todd Jackson, for mentoring the female Intelligence team employees, but claimed he did not do so "because he's Black."  Mr. Jackson himself later confirmed this account to Mr. Ingrasselino during his training after he was hired.  Mr. Ingrasselino expressed concern to Mr. Eversole regarding his distain and mistreatment of female employees, and objected to any prohibition on interacting with colleagues and teammates just because of their gender.

88.    Mr. Ingrasselino, who would often see these women upset and crying over Mr. Eversole's treatment of them, attempted to raise their mistreatment with Mr. Eversole, but was in response ordered by Mr. Eversole not to engage with the women.  One morning, Mr. Eversole ordered that the doors to the women's offices be removed, something he had never done for any other employee.  ***Mr. Ingrasselino again voiced his concerns to Company leadership and HR, including Directors and Vice Presidents Jim Rivera, Darren Claphan, Todd Jackson, Cameron Watkins, Alexandria Baker, and Lauren Wyngant, about the targeting of these women, which he indicated could cause legal and liability issues, and was told by them to keep quiet and not get involved or that he would be fired.***

89.    Mr. Ingrasselino was also disturbed by the Company's senior executives' sexualization of female employees.  Specifically, Mr. Ingrasselino took issue with Mr. Eversole requiring Alexandria Baker, Director of Security Operations, a female direct report of Mr. Ingrasselino, to cancel her previously approved time off and come to the office, only to apparently sit with Mr. Eversole and "hang out" with him for no apparent legitimate reason.  After Mr. Ingrasselino started his role, Ms. Baker would often seek his help when Mr. Eversole would inappropriately overburden her, informing Mr. Ingrasselino that she felt harassed and unfairly targeted.  ***Mr. Ingrasselino approached Mr. Eversole and inquired as to Ms. Baker's job***

*description, schedule, and responsibilities so that he could attempt to limit her forced PTO cancellations and provide a better work/life balance*. Mr. Ingrasselino further informed Mr. Eversole that he believed Ms. Baker was being unfairly singled out by him and not given adequate time off when requested. Mr. Ingrasselino further informed Mr. Eversole that Ms. Baker had concerns about his inappropriate treatment of her. Without even being given the chance to finish articulating his concerns, Mr. Eversole immediately shut Mr. Ingrasselino down, telling him not to speak of the matter, and that Mr. Eversole would contact Ms. Baker directly to assign her duties, bypassing her direct supervisor, Mr. Ingrasselino, in doing so. At one point, ***Mr. Eversole explicitly told Mr. Ingrasselino that he (Mr. Eversole) and Mr. Dolan kept Ms. Baker around because they liked to look at her.*** Mr. Ingrasselino was prevented from carrying out his efforts to alleviate the situation for Ms. Baker. ***Thereafter, Mr. Ingrasselino raised the issues of Ms. Baker's concerns and the lack of structure concerning work hours with respect to her and other direct reports to Human Resources. He complained of this and of his own mistreatment by Mr. Eversole to Glenn Macapagal of Human Resources as recently as a week prior to his termination.***

### 7. *Mr. Ingrasselino Opposed MSG's Willful Exclusion of Police Dogs at MSG, Citing His Safety Concerns and Resulting Contractual Violations*

90.    Mr. Ingrasselino during the course of his reporting directly to Mr. Eversole witnessed what he viewed as open contempt for policies, laws, and regulations, which made it challenging for him to oppose additional wrongful actions he believed to be occurring. In one such example, Mr. Eversole, who is aware of Mr. Dolan's disdain for dogs and especially K-9s (police dogs), on information and belief, began fabricating concerns regarding the necessary and often mandatory use of K-9s for bomb sniffing and other security measures on MSG premises. In doing so, he was attempting to fire the company MSG works with that provided K-9s, in an effort

to entirely ban dogs from MSG property. However, the use of K-9s is not only vital to ensuring the safety of MSG employees and public guests, but also a mandated practice by the National Hockey League and National Basketball Association, sports organizations that have partnerships with MSG. ***Despite Mr. Ingrasselino and other Company leaders expressing concerns over Mr. Eversole's clear violation of the policies, which Mr. Ingrasselino believed MSG was legally required to comply with to avoid, at a minimum, contractual violations, Mr. Eversole did not stop needlessly seeking to restrict the K-9 program.***

### 8. *Mr. Ingrasselino Identified Additional Unlawful Actions*

91.    In addition, Mr. Eversole sought to have Mr. Ingrasselino engage in other unlawful behavior that he did not wish to engage in, but for which counteracting appeared futile given Mr. Eversole's resistance and hostility. For example, ***Mr. Eversole told Cameron Watkins, Scott Depalma, and Mr. Ingrasselino when they were investigating individuals' internal work emails (at the direction of Mr. Eversole), that they also needed to figure out how to get into MSG employees' personal email accounts to monitor them (in addition to monitoring their work accounts and internet activity, which he also directed Mr. Ingrasselino to undertake). Mr. Ingrasselino did not formally object to this directive to break into employees' personal email accounts, which he thought was clearly illegal, because he thought it would be futile to do so.***

92.    In another example, ***even during weeks when Mr. Ingrasselino worked 80 to 100 or more hours a week,*** he was instructed not to accurately record the actual hours he worked for both him and his direct reports, but instead ***was instructed to only report a seven-hour per day work week. This practice was not only unfair, but seemed to Mr. Ingrasselino to be unethical and in violation of law. And yet, he did not complain as he thought doing so would be futile.***

**D.     After Enduring Five Months of Discrimination, a Hostile
        Work Environment, and Retaliation for Complaining
        About Unlawful Activity, Mr. Ingrasselino is Terminated**

93.     In furtherance of MSG and Mr. Eversole's discrimination of Mr. Ingrasselino, and
in response to Mr. Ingrasselino's numerous complaints, as detailed above, MSG retaliated against
Mr. Ingrasselino, including by wrongfully terminating him under the guise of verifiably false
pretext, as recounted below.  Many co-workers of Mr. Ingrasselino indicated to him their view that
efforts by Mr. Eversole to target Mr. Ingrasselino resulted from his questioning, voicing of his
concerns, and opposition to what he viewed as unethical and illegal MSG business practices.

94.     In early 2024, Mr. Ingrasselino was invited by his former coworkers and close
friends to an event in Brooklyn, New York, that was set to begin at 8:30 p.m. on February 12,
2024.   Those friends are part of an A-list performer's security team.   Mr. Ingrasselino had
previously disclosed to MSG that prior to his employment for MSG, he had done private security
work for many A-List celebrities and remained in close contact with their security details, families,
teams, and the celebrities as well.  He also disclosed to MSG the LLC he owns, through which he
offered services as a security consultant and provided executive security services for A-list clients,
which had remained dormant and non-functioning since commencing his employment with MSG
in October 2023.  ***Not only did no one at MSG express any concerns over Mr. Ingrasselino's
network or company, Mr. Eversole expressed being pleased with it and often bragged of Mr.
Ingrasselino's connection to celebrities.   In fact, Mr. Eversole had stated that he is glad Mr.
Ingrasselino has this relationship as it could be leveraged to MSG's advantage.***   Furthermore,
as reflected in documents, MSG took advantage of that leveraging, including by Mr. Eversole
directing Mr. Ingrasselino to connect with MSG Celebrity Relations Coordinator Freya Grant on
several occasions to reach out to his celebrity contacts to offer Knicks and Rangers tickets to allow

MSG to garner visibility for the teams.  Additionally, Mr. Eversole directed Mr. Ingrasselino to contact his celebrity connections after the opening of the Sphere in Las Vegas, to invite as much talent as possible to events to further MSG's clout and stardom.

95.    Prior to accepting the invitation to attend the event on February 12, Mr. Ingrasselino informed his team members that he was attending the event that evening and would be available by phone if needed.  However, Mr. Ingrasselino did not expect any issues, as he had already completed all his assignments for the day, checked the MSG calendar of events and his team's schedule, and confirmed that he was able to attend as it was a quiet, "dark" night at MSG. Furthermore, Mr. Eversole and Mr. Dolan were traveling on the West Coast, so his responsibilities to either of them would only be if an emergency arose, in which case Mr. Ingrasselino would be ready to assist.

96.    Additionally, during the week leading up to the event and prior to deciding on whether to attend, ***Mr. Ingrasselino told Mr. Eversole that he had been invited to attend the event, jokingly adding that he would say "hi" to the A-list celebrity for him as he knew Mr. Eversole liked to brag about Mr. Ingrasselino's connections.***  Despite his awareness, at no point prior to the event did Mr. Eversole express any concern over Mr. Ingrasselino's attendance at the event, nor did Mr. Eversole ask him not to attend.

97.    Once Mr. Ingrasselino arrived at the event venue, he waited for his friends (security personnel), who proceeded to escort the A-list celebrity they worked for inside the venue.  When they did, Mr. Ingrasselino remained outside with the celebrity's mother for the crowd of fans and paparazzi to clear up before entering the building.  After the show, Mr. Ingrasselino left, went home, and reported to work as usual the following morning.

98.    On February 20, 2024, roughly one week later, Mr. Ingrasselino was

inconspicuously called in to Mr. Eversole's office for what was conveyed via an invite as being a "catch up" meeting.  Once he arrived, he found Mr. Eversole accompanied by Senior Vice President Ryan Dupree, and Senior Director of People Practices Glenn Macapagal.  Mr. Eversole proceeded to ask Mr. Ingrasselino if he was aware of MSGs "outside employment" policy, which Mr. Ingrasselino had never heard of, let alone seen memorialized anywhere.  Mr. Ingrasselino added that he had informed Mr. Eversole of his LLC.  In fact, when Mr. Ingrasselino started working for Mr. Eversole – not realizing how busy he would be in the position – Mr. Ingrasselino had asked Mr. Eversole whether he needed to be informed of any outside work he performed, to which Mr. Eversole, under no ambiguous terms, replied there is "No need, as long as you are available every time I need you, everyone does it."  ***To be clear, Mr. Ingrasselino performed no outside work during his employment for MSG – he had no time to do so.***

99.    During the meeting, Mr. Eversole went on to cryptically ask Mr. Ingrasselino if he was aware of what a "conflict of interest" was, although he clearly knew that Mr. Ingrasselino, who had decades of work in security and law enforcement, did have such knowledge.  Mr. Eversole proceeded to show Mr. Ingrasselino a picture of him standing outside the February 12, 2024 event and questioned whether Mr. Ingrasselino believed that to be a conflict of interest, which he did not.  Mr. Eversole then asked whether Mr. Ingrasselino believed he should have received permission to attend the event, disregarding that Mr. Ingrasselino had, in fact, made him aware of his invitation and plans to attend as a spectator.  During this meeting, Mr. Eversole was openly carrying his firearm, which Mr. Ingrasselino believes was intended to intimidate him.

100.    During the meeting, Mr. Eversole callously informed Mr. Ingrasselino "You are fired, today is your last day, you will be escorted out by Ryan and Glenn will give you the paperwork."  ***After firing him, Mr. Eversole, without giving Mr. Ingrasselino the opportunity to***

*defend himself or even question the decision, proceeded to walk out of the office.  Mr. Ingrasselino was then escorted out of the office by Mr. Dupree, subjecting him to another humiliation after enduring many months of consistent torment and abuse at Mr. Eversole's hands.*  He was given less than ten minutes to clean out his office, which he was not able to completely do, and was as a result mandated by Defendants to leave behind some of his belongings, including Apple Airpods, a Christian Dior sling bag, an armored carry plate, and a flashlight.  In addition, MSG has retained numerous other possessions of his which have significant sentimental value, such as framed certifications, degrees, and pictures, including Mr. Ingrasselino's bachelor's and master's degrees, and Certified Protection Professional and Certified Anti-Money-Laundering Specialist certifications, as well as 30 challenge coins he collected throughout his years of police and security service.  Some belongings were packed up and mailed to him days later, although several items of value were smashed and broken, and others remain in MSG's possession and have not been returned or reimbursed, despite MSG's inquiry as to the contents and Mr. Ingrasselino's counsel providing MSG an itemized list of the specific property.

101.    *Even if Mr. Ingrasselino had been working at the February 12, 2024 event, which he was not, he and his colleagues were aware of no MSG policy prohibiting outside employment for its employees, and Mr. Ingrasselino is aware – as was MSG and Mr. Eversole – of numerous MSG employees who, unlike himself, did and do obtain outside employment gigs without any reprimand.*  These not only include Mr. Ingrasselino's predecessor in the role, but other directors, managers, and vice presidents at the Company who had obtained outside employment without penalty.  Mr. Eversole had specifically known about and allowed other employees to conduct outside business while they were employed at MSG without issue, including his Senior Vice President Darren Claphan, who worked for Xtract One, and his Director of Intelligence Lauren

Wygant, who was self-employed by her own company, Soteria & Shield.

102.    On the day that Mr. Ingrasselino was terminated, he was informed by several former colleagues that Mr. Eversole had already hired someone to fill his position, further demonstrating the pretextual nature of the absurd allegation purported to underlie Mr. Ingrasselino's termination.

**E.    Defendant MSG Violated Its Agreement with**
**Mr. Ingrasselino, Which Caused Him Damages**

103.    Prior to the filing of this Complaint, counsel for Plaintiff and MSG engaged in discussions regarding possible resolution of the matter.  MSG's counsel proposed engaging in private mediation to see if the matter could be resolved before litigation, but in offering to do so, MSG's counsel confirmed its client would only agree to participate if Mr. Ingrasselino first provided documentary evidence in support of his legal claims.  Mr. Ingrasselino accepted this proposal.  The proposition was initially raised by MSG's counsel on a phone call with Plaintiff's counsel, and was subsequently confirmed in emails between the parties' counsel, which are attached hereto as **Exhibit A**.

104.    Specifically, on August 21, 2024, following a phone call between the parties' counsel, Plaintiff's counsel wrote to MSG's counsel, "I have spoken with Mr. Ingrasselino and, in accordance with your proposal from our call last week, he is amenable to providing some documentary evidence to you prior to mediation in exchange for the agreement that your client, Madison Square Garden, will attend and pay for private mediation with a mutually agreed upon mediator."  In response the next day, MSG's counsel wrote back, "I'm sure this is fine but will confirm with my client."  Thereafter, on September 3, 2024, counsel for MSG wrote to counsel for Plaintiff, "I can confirm that MSG will pay for the cost of a mediation before Dina Jansenson, contingent on your providing documentary or other evidence prior to the mediation supporting

your client's position." On September 13, the parties confirmed with the mediator's office that they were "committed to January 30" as the date of mediation selected and agreed upon by the parties. On September 17, 2024, MSG's counsel confirmed via email to Plaintiff's counsel and the mediator's office who will be in attendance on behalf of MSG.

105. In accordance with the agreement reached between the parties, Plaintiff gathered and produced to MSG numerous documents in support of his legal claims, which had already been communicated to MSG in a letter dated May 15, 2024, and further detailed in a summary emailed to MSG's counsel and the mediator's representative on September 19, 2024. The documentary evidence transmitted to MSG's counsel included approximately 100 screenshots of text messages that supported his claims of discrimination based on age and disabilities, and his whistleblower claims. The text messages also supported Mr. Ingrasselino's claims that Defendants' purported reason for his termination (as conveyed to him by Mr. Eversole on his termination date) were false and pretextual.

106. Additionally, Plaintiff transmitted to MSG's counsel an affirmation from former Vice President of Security for MSG Ty Munn that detailed his support for many of Plaintiff's allegations, including Mr. Eversole's unsafe, unethical, and illegal directions and actions – such as dangerous interference with individuals outside of MSG's properties and scope, unlawful surveillance on venue guests due to Mr. Eversole's personal interests, wrongful targeting of individuals with MSG's facial recognition program, violation of K-9 safety protocols due to Mr. Dolan's disdain for dogs, adherence to conflicts of interest over safety with respect to the Xtract One weapons detection system, and Mr. Eversole's illegal open carry of a weapon at MSG – of which Mr. Ingrasselino complained. This Affirmation is attached hereto as **Exhibit B**.

107. Further, in compliance with his agreement with MSG, Mr. Ingrasselino provided to

MSG an affirmation from his neighbor, Fiona Rooney, who confirmed therein that she overheard Mr. Eversole in September 2023 refer to females on the MSG "intel" team as "toxic" and "crazy bitches," and also overheard Mr. Eversole tell Mr. Ingrasselino that (in failing to see a new email which required no action before Mr. Ingrasselino's morning start time), "if you are too old to handle this level of work, I will fire you immediately for this and find someone else who is capable." Ms. Rooney's Affirmation is attached hereto as **Exhibit C**. These are just a few samples of the documentary support provided by Mr. Ingrasselino for his legal claims.

108.    In reliance on MSG's representations to attend (and pay for) the mediation scheduled for January 30, 2025, Mr. Ingrasselino incurred substantial legal fees in connection with producing the documents MSG demanded in exchange for its agreement to mediate. At the mediator's request, both parties confirmed separately via email on December 23, 2024, that they would each submit a mediation statement by January 23, 2025 (a week before the scheduled mediation). Accordingly, Mr. Ingrasselino also engaged and paid his counsel to draft a mediation statement, in addition to paying for work in connection with submitting the evidentiary documentation to MSG. Just when Mr. Ingrasselino's counsel was putting the finishing touches on the mediation statement, on January 21, 2025 – two days prior to the submission deadline – MSG's counsel abruptly informed Mr. Ingrasselino's counsel that MSG would not participate in the mediation, despite being reminded of MSG's contractual obligations to mediate and informed of the financial damage its breach had caused Mr. Ingrasselino. In connection with this breach of the agreement, MSG's counsel made false representations regarding the nature of the parties' agreement and prior communications with Mr. Ingrasselino's counsel, which conflicted with the plain language of the written agreement between the parties.

**F.    Mr. Ingrasselino Has Suffered Damages as a
      Result of Defendants' Discrimination and Retaliation**

109.    As a result of Defendants' discriminatory and retaliatory actions, Plaintiff has suffered severe financial consequences due to loss of employment income, and an enormous setback in the career he has pursued, developed, and loved.

110.    In addition to the financial damages inflicted by Defendants, Plaintiff has also incurred significant emotional distress and physical harm and suffering, which is directly attributed (and exacerbated) by the wrongful treatment detailed above, both during his tenure at MSG and thereafter.    Mr. Ingrasselino's health declined substantially during his employment working directly for Mr. Eversole as a result of the wrongful treatment to which he was subjected.    His Hemoglobin A1C (which measures the average blood sugar levels over the past 2-3 months) increased from a 7 to a 9.3, and he suffered from increased blood pressure, hair loss, and weight gain during his employment and ongoing mistreatment by Mr. Eversole.    Mr. Ingrasselino was further forced to take himself to urgent care on August 8, 2024, in response to extreme stress and anxiety with increased heart rate and palpitations.    Following his wrongful termination, Mr. Ingrasselino continued to suffer emotional distress in response to the unlawful mistreatment by Defendants.

**FIRST CAUSE OF ACTION:
FOR DISCRIMINATION AND RETALIATION UNDER NEW YORK
STATE HUMAN RIGHTS LAW, N.Y. EXEC. LAW § 290 *ET. SEQ.*
(Against All Defendants)**

111.    Plaintiff repeats and realleges each and every allegation made in paragraphs 1 through 110 of this Complaint.

112.    At all times relevant to the allegations herein, MSG was an "employer" as defined under the New York State Human Rights Law, N.Y. Exec Law §§ 290 *et seq.*  ("NYSHRL").

113.    At all times relevant to the allegations herein, MSG was a company registered to do business in the State of New York.

114.    At all times relevant to the allegations herein, Mr. Eversole, in his individual capacity, was Plaintiff's sole supervisor, wielding authority over the terms and conditions of Plaintiff's employment, including the authority to hire and fire Plaintiff, to supervise and control Plaintiff's work schedule and employment conditions, and the responsibility to monitor and maintain Plaintiff's hour records, as well as to manage the general business procedures, the constitution, and the environment of the Threat Management team into which he had hired Plaintiff.

115.    At all times relevant to the allegations herein, Mr. Eversole, in his individual capacity, oversaw and participated in the creation of a hostile work environment for Plaintiff, was, upon information and belief, a participant in Plaintiff's discriminatory treatment, and was the individual who unlawfully terminated Mr. Ingrasselino's employment.  MSG, Mr. Ingrasselino's employer, ratified and effected the unlawful discriminatory behavior.

116.    New York Exec. Law § 296.1(a) provides that "It shall be an unlawful discriminatory practice[ f]or an employer or licensing agency, because of an individual's age, race, creed, color, national origin, citizenship or immigration status, sexual orientation, gender identity of expression, military status, sex, disability, predisposing genetic characteristics, familial status, marital status, or status as a victim of domestic violence, to refuse to hire or employ or to bar or to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment."

117.    New York Exec. Law § 296.7 provides, in part, that "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to

retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified or assisted in any proceeding under this article."

118.    Under the NYSHRL, Plaintiff's medical conditions, including diabetes, constituted disabilities.

119.    Plaintiff has documented medical records of his disabilities.

120.    Defendants regarded Plaintiff as having disabilities under the NYSHRL.

121.    Plaintiff was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation.

122.    Defendants MSG and John Eversole created a hostile and offensive work environment for Plaintiff through adverse actions and practices on the basis of his disabilities, discriminated against Plaintiff in response to his disabilities, requests for disability accommodations, and retaliated against him for requesting disability accommodations, by subjecting him to verbal attacks, targeting him falsely based on performance allegations, and by terminating his employment despite his strong work performance, reliability, and commitment and dedication to MSG.

123.    Defendants MSG and John Eversole created, fostered, condoned, accepted, ratified, and/or negligently failed to prevent or remedy a discriminatory and hostile work environment through adverse actions and practices against Plaintiff on the basis of his age in violation of the NYSHRL by subjecting him to mistreatment, including by treating him distinctly based on his age, including as compared with similarly situated employees on that basis, and among other things, favoring younger employees, subjecting him to verbal attacks, targeting him falsely based on performance allegations, and terminating his employment despite his strong work performance,

reliability, commitment, and dedication to MSG.

124.    Defendant Eversole also aided and abetted MSG's unlawful actions under the NYSHRL.

125.    These actions alleged herein constitute unlawful discrimination and retaliation in violation of the NYSHRL.

126.    As a direct, proximate, and foreseeable result of Defendants' violations of the NYSHRL, Plaintiff suffered humiliation, embarrassment, physical, mental and emotional distress, damage to his reputation and economic opportunities, and loss of wages, other compensation, and benefits.

127.    As a further proximate result of Defendants' unlawful employment practices, Plaintiff has had to incur attorneys' fees, costs, and incidental expenses.  Defendants' conduct was malicious, wanton, and reckless or in willful disregard for Plaintiff's rights.  As a result of the wrongful actions of Defendants, Plaintiff is entitled to recover actual damages and punitive damages, plus attorneys' fees and interest, in an amount to be proven at trial.

### SECOND CAUSE OF ACTION:
### FOR DISCRIMINATION AND RETALIATION UNDER THE
### NEW YORK CITY HUMAN RIGHTS LAW, N.Y.C. ADMIN. CODE §§ 8-107 *ET. SEQ.*
### (Against All Defendants)

128.    Plaintiff repeats and realleges each and every allegation made in paragraphs 1 through 127 of this Complaint.

129.    At all relevant times to the allegations herein, Defendant MSG was an "employer" as defined under the New York City Human Rights Law, N.Y.C. Admin. Code §§ 8-107 *et seq.* ("NYCHRL").

130.    At all times relevant to the allegations herein, Mr. Eversole, in his individual capacity, was Plaintiff's direct supervisor, wielding ultimate authority over the terms and conditions of Plaintiff's employment, including the authority to hire and fire Plaintiff, supervise and control Plaintiff's work schedule and employment conditions, determine Plaintiff's compensation, and maintain Plaintiff's hour records.

131.    At all times relevant to the allegations herein, Defendant Eversole, in his individual capacity, oversaw and participated in the creation of a hostile work environment for Plaintiff, and in Plaintiff's discriminatory and retaliatory treatment, including his termination of employment.

132.    N.Y.C. Admin. Code § 8-107.1(a) provides that "It shall be an unlawful discriminatory practice[ f]or an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, partnership status, caregiver status, sexual and reproductive health decisions, sexual orientation, uniformed service, height, weight, or immigration or citizenship status of any person:

> (1) To represent that any employment or position is not available when in fact it is available;
>
> (2) To refuse to hire or employ or to bar or to discharge from employment such person; or
>
> (3) To discriminate against such person in compensation or in terms, conditions or privileges of employment."

133.    N.Y.C. Admin. Code § 8-107.7 provides that "It shall be an unlawful discriminatory practice for any person engaged in any activity to which this chapter applies to retaliate or discriminate in any manner against any person because such person has (i) opposed any practice forbidden under this chapter, (ii) filed a complaint, testified or assisted in any proceeding under

this chapter, (iii) commenced a civil action alleging the commission of an act which would be an unlawful discriminatory practice under this chapter, (iv) assisted the commission or the corporation counsel in an investigation commenced pursuant to this title, (v) requested a reasonable accommodation under this chapter, or (vi) provided any information to the commission pursuant to the terms of a conciliation agreement made pursuant to section 8-115 of this chapter. The retaliation or discrimination complained of under this subdivision need not result in an ultimate action with respect to employment, housing or a public accommodation or in a materially adverse change in the terms and conditions of employment, housing, or a public accommodation, provided, however, that the retaliatory or discriminatory act or acts complained of must be reasonably likely to deter a person from engaging in protected activity."

134.    Under the NYCHRL, Plaintiff's medical conditions, including diabetes, constituted disabilities.

135.    Defendants MSG and John Eversole regarded Plaintiff as having disabilities under the NYCHRL.

136.    Plaintiff has documented medical records of his disabilities.

137.    Plaintiff was otherwise qualified to perform the essential functions of his job, with or without reasonable accommodation.

138.    Defendants created a hostile and offensive work environment for Plaintiff through adverse actions and practices based on his disabilities, discriminated against Plaintiff in response to his disabilities and requests for disability accommodations, and retaliated against him for requesting disability accommodations, by subjecting him to verbal attacks, targeting him falsely based on performance allegations, and terminating his employment despite his strong work performance, reliability, commitment, and dedication to MSG.

139.    Defendants created, fostered, condoned, accepted, ratified, and/or negligently failed to prevent or remedy a discriminatory and hostile work environment through adverse actions and practices against Plaintiff on the basis of his age in violation of the NYCHRL by subjecting him to mistreatment, including by treating him less well and distinctly based on his age, including as compared with similarly situated employees on that basis, and among other things, favoring younger employees, subjecting him to verbal attacks, targeting him falsely based on performance allegations, and terminating his employment despite his strong work performance, reliability, commitment, and dedication to MSG.

140.    These actions, taken singly and in their entirety, constituted unlawful discrimination in violation of the NYCHRL.

141.    As a direct, proximate and foreseeable result of Defendants' violations of the NYCHRL, Plaintiff suffered humiliation, embarrassment, physical, mental and emotional distress, damage to his reputation and economic opportunities, and loss of wages, other compensation and benefits.

142.    As a further proximate result of Defendants' unlawful employment practices, Plaintiff has had to incur attorneys' fees, costs and incidental expenses.  Defendants' conduct was malicious, wanton, and reckless or in willful disregard for Mr. Ingrasselino's rights.  As a result of the wrongful actions of Defendants, Plaintiff is entitled to recover actual damages and punitive damages, plus attorneys' fees and interest, in an amount to be proven at trial.

### THIRD CAUSE OF ACTION:
### FOR RETALIATION UNDER NEW YORK
### LABOR LAW § 740 – WHISTLEBLOWER LAW
### (Against MSG)

143.    Plaintiff repeats and realleges each and every allegation made in paragraphs 1 through 142 of this Complaint.

144.    New York Labor Law § 740 provides that: It shall be unlawful for an employer to retaliate against an employee who engages in protected activities, including but not limited to: (a) Disclosing, or threatening to disclose to a supervisor or to a public body, an activity, policy, or practice of the employer that the employee reasonably believes is in violation of law, rule, or regulation or poses a substantial and specific danger to the public health or safety; (b) Providing information to, or testifying before, any public body conducting an investigation, hearing, or inquiry into any such activity, policy, or practice by the employer; or (c) Objecting to, or refusing to participate in any such activity, policy, or practice.

145.    As described herein, Plaintiff was an employee of MSG.

146.    Plaintiff engaged in protected activities under New York Labor Law § 740 as detailed above, including but not limited to, raising concerns and making internal complaints regarding unethical and illegal activities and practices, including but not limited to failure to ensure the safety of employees by forcing them into dangerous situation without appropriate safety measures in place;  permitting and encouraging employees to carry firearms in the workplace; unlawfully surveilling and invading the privacy of individuals outside the scope of MSG's business needs;  unlawful use of MSG's facial recognition technology;  risking the safety of the public, patrons, and employees through use of faulty security technology due to an alleged conflict of interest;  ignoring public safety concerns and willful exclusion of public safety measures;  gender-

based discrimination against women;  and violating contractual agreements, which Mr. Ingrasselino witnessed.

147.    Mr. Ingrasselino also observed and took issue with other unlawful behavior Defendants engaged in which he thought was illegal but believed would be futile to complain about, including but not limited to directions from Mr. Eversole to figure out how to access MSG employees' personal email accounts to monitor them, and instruction by Mr. Eversole that Mr. Ingrasselino underreport and not accurately record the actual hours he worked for both himself and his direct reports.

148.    After Plaintiff engaged in activities protected by New York Labor Law § 740, MSG took adverse and retaliatory employment actions against Plaintiff, up to and including termination of his employment, which would dissuade a reasonable employee from engaging in similar protected activities.

149.    As a result of MSG's retaliatory conduct in violation of New York Labor Law § 740, Plaintiff has suffered, and continues to suffer, pecuniary losses, and is entitled to back pay, front pay, lost benefits, interest, reasonable attorneys' fees and costs, and other relief.

150.    MSG's unlawful retaliatory actions constitute malicious, willful, and wanton violations of New York Labor Law § 740, for which Plaintiff is entitled to an award of punitive damages under this statute.

151.    MSG is further subject to civil penalties for their violations herein.

### FOURTH CAUSE OF ACTION:
### BREACH OF CONTRACT
### (against MSG)

152.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 151 of this Complaint.

153.    MSG and Mr. Ingrasselino entered into an enforceable agreement between them.

154.    Mr. Ingrasselino performed all of his obligations under the agreement.

155.    MSG breached the parties' agreement by refusing to mediate after Mr. Ingrasselino completed all of the prerequisite conditions that obligated MSG to do so.

156.    MSG has caused damage to Mr. Ingrasselino as a result of its breach of contract, including attorneys' fees and costs he paid to meet MSG's conditions, and in reliance on MSG's promise to mediate by fulfilling MSG and the mediator's requests and obligations in preparation for mediation.

### FIFTH CAUSE OF ACTION:
### PROMISSORY ESTOPPEL
### (against MSG)

157.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 156 of this Complaint.

158.    MSG and its agent made unequivocal and express verbal and written promises, representations, and guarantees to Plaintiff, including the promise to engage in and attend mediation if he provided MSG with documentary evidence that supported his claims against it.

159.    Plaintiff fulfilled his obligation in providing MSG with requested documentary evidence supporting his claims against the Company, and relied upon these representations to his detriment.

160.    Such reliance by Plaintiff was reasonably foreseeable at the time MSG and its agent made these promises.

161.    Plaintiff violated those promises by failing to engage in and attend the mediation.

162.    As a result of MSG's actions, Plaintiff has suffered damages, including attorneys' fees and costs he paid to meet MSG's requirements, and in reliance on MSG's promise to mediate by fulfilling MSG and the mediator's requirements in preparation for mediation.

### SIXTH CAUSE OF ACTION:
### VIOLATION OF THE DUTY OF GOOD FAITH AND FAIR DEALING
### (against Defendant MSG)

163.    Mr. Ingrasselino repeats and realleges each and every allegation contained in paragraphs 1 through 162 of this Complaint.

164.    Under New York law, each party to a contract has a duty of good faith and fair dealing toward the other party to the contract.

165.    MSG, by its actions and inactions as set forth herein, violated its duty of good faith and fair dealing towards Mr. Ingrasselino.

166.    As a result of MSG's breach of the duty of good faith and fair dealing, Mr. Ingrasselino has been damaged.

### SEVENTH CAUSE OF ACTION:
### VIOLATION OF NEW YORK LABOR LAW SECTION 201-d
### (against Defendant MSG)

167.    Mr. Ingrasselino repeats and realleges each and every allegation contained in paragraphs 1 through 166 of this Complaint.

168.    During Mr. Ingrasselino's employment for MSG – outside of work hours and premises, and without using Defendant's equipment or property – Plaintiff engaged in lawful recreational activity by attending a concert as a guest of his friends.

169.    Defendant MSG was aware of Plaintiff's lawful recreational activity.

170.    Because of Plaintiff's engagement in this lawful recreational activity, Defendant retaliated against Plaintiff by terminating his employment.

171.    Defendant MSG's actions constitute unlawful discrimination against an individual based on their engagement in certain activities, in violation of New York Labor Law § 201-d.

172.    As a direct result of Defendant MSG's unlawful conduct, Plaintiff has suffered damages, including but not limited to pecuniary losses, and is entitled to back pay, front pay, lost benefits, reputational and emotional distress damages, interest, reasonable attorneys' fees and costs, and other relief.

### EIGHTH CAUSE OF ACTION:
### <u>UNJUST ENRICHMENT</u>
### (against MSG)

173.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 172 of this Complaint.

174.    MSG has retained physical objects that are Mr. Ingrasselino's property, for which Mr. Ingrasselino has not been compensated.

175.    MSG has benefitted from retaining Mr. Ingrasselino's property at his expense.

176.    In equity and good conscience, if MSG is not required to return Mr. Ingrasselino's property and/or reimburse him for his property, then MSG will be unjustly enriched.

### NINTH CAUSE OF ACTION:
### <u>CONVERSION</u>
### (against MSG)

177.    Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 176 of this Complaint.

178.     MSG stole and converted Mr. Ingrasselino's property, causing him substantial damage.

179.    As a result of this theft and conversion, Mr. Ingrasselino has been damaged in an amount to be determined at trial plus attorneys' fees and costs, and prejudgment interest.

MSG acted intentionally, maliciously, and in wanton disregard of Mr. Ingrasselino's rights, and punitive damages should be awarded as against MSG.

## DEMAND FOR RELIEF

**WHEREFORE**, Plaintiff demands judgment against Defendants as follows:

a)    finding that Defendants discriminated and retaliated against Plaintiff in violation of the New York State Human Rights Law, and New York City Human Rights Law, and retaliated against Plaintiff in violation of the New York Labor Law;

b)    awarding Plaintiff compensatory damages and remedies, including back pay, front pay, lost wages and benefits, physical and emotional distress, pain and suffering, and medical expenses, and all other benefits to which Plaintiff is entitled, in an amount to be determined at trial;

c)    awarding Plaintiff punitive damages under applicable law, sufficient to punish and deter continuation of Defendants' unlawful employment practices, in an amount to be determined at trial;

d)    awarding damages in an amount to be proven at trial for breach of contract, promissory estoppel, and for violation of the duty of good faith and fair dealing;

e)    awarding damages in an amount to be proven at trial for unjust enrichment;

f)    awarding damages in an amount to be proven at trial for conversion;

g)    awarding Plaintiff the costs of this action, together with reasonable attorneys' fees, as provided under applicable law;

h)    awarding Plaintiff pre- and post-judgment interest as provided by applicable law;

i)      awarding Plaintiff a tax offset award with respect to the portion of the award that constitutes taxable income to Plaintiff under applicable law, and a gross-up to account for the extent to which the award of the tax offset, itself, causes an increase in Plaintiff's tax bracket at a rate determined and amount to be determined at trial; and

j)       awarding Plaintiff such other and further relief as this Court deems necessary and proper.

### **JURY DEMAND**

Plaintiff hereby demands a trial by jury of all issues so triable.

Dated: New York, New York
       September 25, 2025

                          REAVIS PAGE JUMP LLP

              By:    _Ethan Krasnoo_____
                     Ethan M. Krasnoo, Esq.
                     Alice K. Jump, Esq.
                     41 Madison Avenue, 41st Floor
                     New York, New York 10010
                     Tel.: (212) 763-4100
                     EKrasnoo@rpjlaw.com
                     AJump@rpjlaw.com

                     *Attorneys for Plaintiff Donald Ingrasselino*